**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ABDALLA MAALIM, on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br>     v.<br><br>CITY OF CHICAGO,<br><br>       Defendant. | No. _____<br><br><br>**JURY TRIAL REQUESTED** |

## CLASS ACTION COMPLAINT

### I.     INTRODUCTION

1. Plaintiff Abdalla Maalim drove for Uber and Lyft in the City of Chicago up until December 24, 2024, when Uber permanently deactivated his account due to a vague and unsubstantiated allegation of unsafe driving. Due to the City of Chicago's Transportation Network Providers ("TNP") Rules (referred to herein as the "TNP Rules"), Uber's unilateral deactivation had the effect of blacklisting him—leaving him unable to perform rideshare work for all similar companies in the City. Based on Uber's deactivation, the City automatically and indefinitely suspended Plaintiff's City-issued chauffeur license—without providing Plaintiff any avenue to appeal the decision or have a hearing in which it would be determined whether or not public safety required him not to continue driving passengers.

2. This civil rights lawsuit challenges the constitutionality of the City of Chicago's TNP Rules, which regulate the rideshare industry in the City. The following allegations are based on personal knowledge as to Plaintiff's own conduct and on information and belief as to the acts of others.

1

3. Plaintiff is an Illinois resident who seeks declaratory, injunctive, and compensatory relief on behalf of himself and all others similarly situated for violations of their rights guaranteed by the Fourteenth Amendment to the United States Constitution.

4. Under TNP Rule 1.10, a TNP licensee such as Uber or Lyft must notify the City of Chicago any time it deactivates a driver from its platform "for conduct that gave rise to a public safety concern." TNP Rule 5.02 provides that such a deactivation automatically and indefinitely suspends that driver's City-issued TNP chauffeur license, which drivers are required to possess in order to perform rideshare work in the City.

5. Under this statutory scheme, deactivation from one TNP platform effectively blacklists the driver, resulting in deactivation across all TNP platforms. In other words, deactivation from one TNP platform results in the driver being unable to perform rideshare work in the City of Chicago.

6. The City of Chicago deprives drivers of their TNP chauffeur licenses based on vague and unsupported allegations of a "public safety concern"—without providing any procedural safeguards.

7. The City of Chicago's enforcement of TNP Rules 1.10 and 5.02, which deprive rideshare drivers of a constitutionally protected property interest without any procedural due process, violates the Fourteenth Amendment to the United States Constitution.

8. These TNP Rules are facially unconstitutional and unconstitutional as applied to Plaintiff and the class members.

## II.    PARTIES

9.    Plaintiff Abdalla Maalim is an adult resident of Chicago, Illinois.

10.    Plaintiff seeks to represent a class of similarly situated current and former rideshare drivers under 42 U.S.C. § 1983 pursuant to Federal Rule of Civil Procedure 23. The class sought to be certified is defined as:

> All current and former drivers for transportation network providers ("TNPs") whose TNP chauffeur licenses have been suspended by the City of Chicago due to deactivation from a TNP licensee's platform pursuant to TNP Rules 1.10 and 5.02.

11.    Defendant City of Chicago is a municipal corporation which is authorized by statute to regulate taxis and all others pursuing like occupations. *See* 65 ILCS 5/11-42-6. The City of Chicago regulates rideshare companies such as Uber and Lyft. The Department of Business Affairs and Consumer Protection is an executive department of the City of Chicago. *See* Municipal Code of Chicago ("MCC") § 2-25-020.

## III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution, namely the Fourteenth Amendment. This action is brought pursuant to 42 U.S.C. § 1983.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims took place in this district.

## IV.    STATEMENT OF FACTS

### A.    MCC Chapter 9-115 and the TNP Rules

14.    MCC Chapter 9-115 establishes a licensing and regulatory framework for the rideshare industry.

3

15. Rideshare companies such as Uber and Lyft are required to obtain a "transportation network provider" ("TNP") license to operate in the City of Chicago. MCC § 9-115-020.

16. Individual rideshare drivers such as Plaintiff must acquire a "TNP chauffeur license" before a TNP licensee such as Uber or Lyft may engage them as a driver. *Id.* § 9-115-150. TNP licensees must apply for TNP chauffeur licenses on the drivers' behalf, and in doing so, attest that the drivers are eligible for licenses under the MCC and state law. *Id.* § 9-115-150(b)(4).

17. The Commissioner of the Department of Business Affairs and Consumer Protection ("BACP") is authorized to enforce MCC Chapter 9-115 and promulgate rules and regulations. *Id.* § 9-115-250(c).

18. In 2020, the City of Chicago, through the Commissioner of the BACP, promulgated a set of TNP Rules that rideshare companies must follow.[1] The TNP Rules are effective as of August 10, 2020.

19. The TNP Rules govern the conduct and relationship of TNPs and their drivers with the City of Chicago. There are only two (2) major TNPs operating within the Chicago area—Uber and Lyft.

20. Under the TNP Rules, a rideshare driver such as Plaintiff may be effectively stripped of his or her TNP chauffeur license based on a vague and unverified allegation of a "public safety concern"—across all TNP platforms—without any procedural safeguards, barring that driver from working as a rideshare driver without procedural due process.

---

[1] Available at https://tinyurl.com/m2mnkfer.

21.     Under TNP Rule 1.10, a TNP licensee must notify the City any time it permanently deactivates a driver from its platform "for conduct that gave rise to a public safety concern." Rule 1.10 itemizes nine reasons that constitute a "public safety concern":

1.  Criminal complaint or arrest;
2.  Criminal investigation;
3.  Allegation or complaint of sexual misconduct;
4.  Allegation or complaint of traffic accident or incident that resulted in a police report or insurance claim being filed;
5.  Allegation or complaint of use or possession of an illegal drug or substance;
6.  Allegation or complaint of driving under the influence of intoxicating beverages, drugs, or substances;
7.  Allegation or complaint of assault or battery;
8.  Unauthorized TNP driver account sharing; or
9.  Use of fraudulent information or documents during TNP driver onboarding process, including, but not limited to, identity theft.

Rule 1.10 also contains a catch-all provision, providing that TNP licensees must notify the City where deactivation occurs due to "[c]onduct that gave rise to a public safety concern not itemized above in this section." A TNP licensee must notify the City within four (4) business days of deactivating a driver for reasons specified in Rule 1.10.

22.     Rule 5.02 provides that deactivation from a licensed TNP platform (such as Uber or Lyft) immediately and indefinitely suspends the driver's TNP chauffeur license.

23.     Under these rules, a driver's deactivation from one TNP platform leads to the immediate suspension of that driver's TNP chauffeur license, which, in turn, leads to deactivation from all TNP platforms. In other words, due to the TNP Rules, deactivation from a TNP platform effectively blacklists the driver, preventing him or her from working as a rideshare driver in the Chicago area.

24.     The City of Chicago provides no procedural safeguards for drivers who have had their TNP chauffeur licenses suspended due to deactivation from a TNP platform.

5

25.     The TNP Rules have led to an epidemic of rideshare driver deactivations and consequent TNP chauffeur license suspensions, all of which have occurred with no procedural safeguards for the affected drivers.

26.     According to BACP data obtained by DePaul University's Center for Journalism Integrity & Excellence in 2025, only 3.7% of rideshare drivers in the last five years had their TNP chauffeur licenses reinstated once they were deactivated. 20,659 rideshare drivers in Chicago were deactivated by Lyft and Uber and lost their TNP chauffeur licenses from 2019 to 2024; the number of TNP chauffeur license deactivations increased by 1,300% in that five-year timeframe.[2] 4,131 drivers had been deactivated pursuant to TNP Rule 1.10's catchall provision since 2019—the third-highest reason for deactivation.

**B.      Plaintiff Maalim's Deactivation from Uber and Lyft**

27.     Plaintiff began working as a rideshare driver for Uber Technologies, Inc. in September 2023, and he later began working as a rideshare driver for Lyft, Inc.

28.     Driving for Uber and Lyft was Plaintiff's primary source of income. Plaintiff depended on this income to support his family, including his five children.

29.     On December 24, 2024, Plaintiff was notified by Uber that his account on Uber's platform was being deactivated due to "unsafe driving."

30.     On December 24, 2024—the same day that Plaintiff was deactivated from Uber—Plaintiff was also deactivated from Lyft's platform.

---

[2]     *See* DePaul's Ctr. for Journalism Integrity & Excellence, *'Heartbreaking': Rideshare Drivers Say They Were Suddenly Deactivated, Left Jobless*, NBC Chicago (Mar. 14, 2025), https://www.nbcchicago.com/news/local/heartbreaking-rideshare-drivers-say-suddenly-deactivated-jobless-chicago/3698042/.

31.     On October 6, 2025, Plaintiff received an email from Lyft explaining the basis for his deactivation. In this email, Lyft's representative wrote:

> Pursuant to the City of Chicago's Rule TNP 1.10, Lyft was notified that you have been deactivated by another Transportation Network Provider (TNP) due to conduct that gave rise to a public safety concern.
>
> As such, you are also deactivated from the Lyft platform.
>
> Lyft and other ridesharing companies are Transportation Network Providers (TNPs). Lyft deactivated your account due to a notification from another TNP of your deactivation on their platform.
>
> Lyft does not have information about the underlying incident.
>
> If you would like more information about the reported incident, we recommend you follow up with the TNP that deactivated your account on their platform.
>
> . . .
>
> Only the TNP that initially deactivated your account is able to resolve your account deactivation. Neither the City of Chicago nor the Department of Business Affairs and Consumer Protection (BACP) can assist you.

32.     Based on this email, it is clear that Lyft summarily deactivated Plaintiff's Lyft account on the same day of Plaintiff's deactivation from Uber, despite having no factual knowledge about any purported underlying incident and without providing any procedural safeguards of its own, pursuant to and compelled by the TNP Rules.

33.     Plaintiff reached out to the BACP via email in an effort to appeal the suspension of his TNP chauffeur license.

34.     Plaintiff received an email response from the BACP. A representative from the BACP responded:

> Based on the information you shared, Uber deactivated your TNP driver account on Uber's platform due to passenger complaints regarding your driving.
>
> Then, Lyft deactivated your TNP driver account on the Lyft platform because Uber deactivated you.

Read the communication that Lyft sent to you. It does state that the City of Chicago and BACP is unable to help you.

. . .

The communication is instructing you to resolve your driver account deactivation with other TNP (Uber, Lyft, etc.) and then present proof of reactivation of driver account.

35. Upon information and belief, Uber disclosed to the City of Chicago, and the City of Chicago and/or Uber disclosed to Lyft that Plaintiff had been deactivated from the Uber platform due to an alleged "public safety concern."

36. This disclosure led to the automatic suspension of Plaintiff's TNP chauffeur license—on all TNP platforms—effectively blacklisting Plaintiff and making him unable to perform any rideshare driving work.

37. Plaintiff never had an opportunity to appeal the decision(s) made by the City of Chicago to suspend his TNP chauffeur license. In fact, a representative from the City explicitly informed Plaintiff that the City could not redress the suspension at all.

38. Due to the City of Chicago's TNP Rules, Plaintiff has sustained damages in the form of lost earnings since December 2024. Plaintiff has had difficulty finding other employment since his deactivation from the Uber and Lyft platforms.

39. Plaintiff has also sustained damages in the form of emotional distress after being stripped of his primary source of income without recourse from the City of Chicago.

## V. CLASS ALLEGATIONS

40. The above and foregoing paragraphs are incorporated herein as if set forth in full.

41. Plaintiff seeks to represent a class of similarly situated rideshare drivers under 42 U.S.C. § 1983 pursuant to Federal Rule of Civil Procedure 23. The class sought to be certified is defined as:

> All current and former drivers for transportation network providers ("TNPs") whose TNP chauffeur licenses have been suspended by the City of Chicago due to deactivation from a TNP licensee's platform pursuant to TNP Rules 1.10 and 5.02.

42. The members of the class are so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of class members who suffered the harm described herein within the statutory period.[3]

43. Because the TNP Rules provide no procedural safeguards for drivers whose TNP chauffeur licenses are suspended due to deactivation from a TNP licensee's platform, Plaintiff and the class members were all stripped of their TNP chauffeur licenses without due process. This lack of due process is the result of the City of Chicago's generally applicable, systematic TNP Rules, which are not dependent on the personal circumstances of the class members. Plaintiff's claims are therefore typical of the claims of the class.

44. Plaintiff will fairly and adequately represent and protect the interests of the class because there is no conflict between the claims of Plaintiff and those of the class. Plaintiff's counsel is competent and experienced in litigating class actions and other complex litigation matters, including procedural due process cases similar to this case.

45. There are questions of law and fact common to the proposed class, which predominate over any questions affecting individual members, including, without limitation:

    a. whether Defendant has violated and continues to violate the Due Process Clause of the Fourteenth Amendment by summarily suspending rideshare drivers' TNP chauffeur licenses without providing any procedural safeguards;

    b. whether rideshare drivers have a constitutionally protected property interest in their TNP chauffeur licenses;

---

[3] *See* DePaul's Ctr. for Journalism Integrity & Excellence, *supra* note 2.

c. whether the City of Chicago deprives rideshare drivers of a constitutionally protected property interest by automatically and indefinitely suspending TNP chauffeur licenses upon drivers' deactivation from a TNP platform;

d. what procedural safeguards the City must put in place to pass constitutional muster in suspending TNP chauffeur licenses;

e. the proper measure of damages sustained by the class members; and

f. whether Defendant should be enjoined from committing such violations in the future.

46. This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2). Defendant acted or refused to act on grounds generally applicable to all class members. Final injunctive and/or declaratory relief is appropriate to the class members as a whole.

47. Plaintiff's claims are typical of the claims of the class in the following ways, without limitation: (a) Plaintiff is a member of the class; (b) Plaintiff's claims arise from the same policies, practices, and course of conduct that form the basis of the claims of the class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the class and involve similar factual circumstances; (d) there are not conflicts between the interests of Plaintiff and the class members; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the class members.

48. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the class members predominate over any questions affecting only individual class members. Namely, the issues of rideshare drivers' property interests in their TNP chauffeur licenses, the City's role in stripping drivers of these licenses, and the procedural safeguards that must be put in place to pass constitutional muster are common to each class member, regardless of the individual circumstances surrounding each driver's deactivation and consequent suspension.

10

49.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expenses that numerous individual actions would entail.

50.     No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy because individual rideshare drivers lack the financial resources to vigorously prosecute lawsuits against Defendant individually.

51.     Members of the class are readily identifiable from the City's own records. Prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant.

52.     Plaintiff intends to request that notice be sent to the Rule 23 class as required by Fed. R. Civ. P. 23(c).

## COUNT I

## VIOLATION OF THE FOURTEENTH AMENDMENT UNDER 42 U.S.C. § 1983 DENIAL OF PROCEDURAL DUE PROCESS

53.     All previous paragraphs are incorporated as though fully set forth herein.

54.     The City of Chicago's TNP Rules 1.10, 5.02, and related rules effectively bar Plaintiff and class members from working as rideshare drivers in the City without providing them with procedural due process.

55. The City of Chicago failed to provide Plaintiff and class members notice or a chance to defend themselves before, pursuant to the TNP Rules, suspending their TNP chauffeur licenses.

56. Procedural due process requires that the government provide notice and an opportunity to be heard before depriving someone of a significant interest, such as his or her ability to work.

57. Plaintiff and class members have a constitutionally protected property interest in their TNP chauffeur licenses, issued by the City of Chicago pursuant to the Municipal Code of Chicago, which drivers are required to obtain to perform rideshare work in the City. *See* MCC § 9-115-150; TNP Rule 1.06.

58. The MCC provides that a TNP chauffeur license shall be issued to a driver or renewed if the applicant meets twelve substantive criteria establishing: their eligibility to drive a motor vehicle; an adequate driving record; completion of City-operated training programs; lack of a criminal history; adequate prior conduct while using their chauffeur license; and compliance with other regulations. MCC § 9-115-150(b).

59. While a TNP chauffeur license will be summarily and indefinitely *suspended* upon a driver's deactivation from a licensed TNP platform, *see* TNP Rule 5.02, a TNP chauffeur license will only be *revoked* by the City for seven enumerated reasons, including failure to comply with a legal process, conviction of a criminal offense involving a felony arising in connection with the provision of transportation services, ineligibility, and types of fraud or dishonesty, *see* TNP Rule 5.13(a). If any of these grounds for revocation exist, the BACP Commissioner shall institute an action with the Department of Administrative Hearings, where the TNP chauffeur license holder will have a hearing in front of an administrative law officer to

determine whether to issue a sanction such as revocation. TNP Rule 5.13(b). The BACP Commission may also *rescind* a TNP chauffeur license obtained erroneously, illegally, by fraud, by misrepresentation, or by willful misstatement or omission of any material fact, but a driver upon rescission may demand a hearing and challenge the basis of rescission. TNP Rule 5.14.

60.     Suspension of a TNP chauffeur license amounts to a deprivation of a protected property interest. A driver cannot drive for a TNP licensee on a suspended chauffeur license, and, due to the scheme perpetuated by the TNP Rules, deactivation from one TNP platform results in suspension of a driver's TNP chauffeur license on *all* platforms. In other words, the automatic suspension of a TNP chauffeur license deprives the driver of his or her property interest in the license.

61.     Moreover, the suspension of a TNP chauffeur license is a deprivation of a property interest perpetuated by the City of Chicago. The TNP Rules create a statutory regime that functionally revokes a driver's TNP chauffeur license without any procedural safeguards because it requires deactivation and indefinite suspension of a driver's TNP chauffeur license based solely on a vague and unverified allegation that the driver engaged in conduct that raises a "public safety concern."

62.     Plus, the City provides fines, suspension of a TNP's license, or revocation of a TNP's license for failure to comply with its rules. A TNP licensee may not engage any person as a driver unless that person possesses a valid TNP chauffeur license, MCC § 9-115-150(a)(1), and a violation of the rules results in fines for each day the violation continues and allows the BACP Commissioner to seek TNP license suspension or revocation, "in addition to restitution or other equitable relief," *id.* §§ 9-115-220(a), 9-115-230(a).

63. The TNP Rules require the City of Chicago to automatically suspend drivers' TNP chauffeur licenses upon receiving a report of deactivation from a TNP platform, such as Uber or Lyft, without providing the drivers notice of the allegation or an opportunity to contest it. Under this system, deactivation from one TNP platform provides notice to other TNP platforms and inevitably leads to deactivation from all TNP platforms—effectively stripping Plaintiff and class members of their ability to work as rideshare drivers without providing any procedural protections.

64. There are no procedural protections for drivers who face suspension of their TNP chauffeur licenses; drivers have no recourse to challenge or appeal the suspension of their TNP chauffeur licenses. Indeed, drivers who contact the BACP are told that the City of Chicago is unable to assist drivers whose TNP chauffeur licenses are suspended.

65. Plaintiffs and class members have a substantial interest in their TNP chauffeur licenses, which are a form of government-created property that allows them to make a living.

66. The risk of an erroneous deprivation of a TNP chauffeur license is high. The TNP Rules provide no procedural safeguards for the indefinite suspension of a TNP chauffeur license, which automatically occurs any time a TNP licensee deactivates a driver due to a "public safety concern." The TNP Rules provide that a TNP chauffeur license will be suspended when a TNP licensee deactivates a driver based on a mere allegation of a public safety concern, and there is no process through which the City of Chicago ensures that a TNP's decision to deactivate a driver is fair.

67. The City of Chicago would not be burdened by providing constitutionally adequate procedural safeguards for drivers facing suspension of their TNP chauffeur licenses due to deactivation from a TNP platform. Indeed, the TNP Rules provide procedural safeguards for

14

drivers facing revocation or rescission of their TNP chauffeur licenses. The City of Chicago does not have a legitimate interest in removing drivers from the workforce based on vague, unsubstantiated allegations of misconduct.

68.     The City of Chicago's automatic and indefinite suspensions of TNP chauffeur licenses pursuant to the TNP Rules lack procedural protections and therefore violate the right to due process under the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff requests that the Court enter the following relief:

a.      an Order certifying the 42 U.S.C. § 1983 claim as a class action pursuant to Fed. R. Civ. P. 23, for designation of Plaintiff as class representative, and for designation of Plaintiff's counsel as class counsel;

b.      a declaratory judgment in favor of Plaintiff against Defendant providing that the imposition of the TNP Rules, specifically TNP Rules 1.10 and 5.02, is unconstitutional both on its face and as applied to Plaintiff;

c.      a permanent injunction in favor of Plaintiff and against Defendant prohibiting Defendant from enforcing TNP Rules 1.10 and 5.02 without providing constitutionally sufficient procedural safeguards;

d.      an award of damages for the violation of constitutional rights;

e.      an award of compensatory damages for loss of income and emotional distress;

f.      an award of Plaintiff's costs and expenses of this action, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

g.      such other and further relief as this Court deems just and proper.

Dated: March 18, 2026                    Respectfully submitted,


                                         /s/Bradley Manewith
                                         Bradley Manewith, #06280535
                                         LICHTEN & LISS-RIORDAN, P.C.
                                         5 Revere Drive, Suite 200
                                         Northbrook, IL 60062
                                         617-994-5800
                                         bmanewith@llrlaw.com


15

Shannon Liss-Riordan (MA BBO #640716, *pro hac vice* forthcoming)
Trevor Byrne (MA BBO #712898, *pro hac vice* forthcoming)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St, Ste 2000
Boston, MA 02116
617-994-5800
sliss@llrlaw.com
tbyrne@llrlaw.com

*Attorneys for Plaintiff and Class Members*

16